**HAZELTINE RESEARCH, Inc., v. ADMIRAL CORP.**

No. 10058.

United States Court of Appeals Seventh Circuit.

July 21, 1950.

Rehearing Denied Sept. 18, 1950.

Francis H. Uriell, and Edmund W. Sinnott, Chicago, Ill., Floyd H. Crews and Morris Relson, New York City, Pope and Ballard, Chicago, Ill., Darby & Darby, New York City, J. Darrell Douglass, Cleveland, Ohio, of counsel, for appellant.

Laurence B. Dodds, Little Neck, N. Y., M. Hudson Rathburn, Chicago, Ill. (Philip F. LaFollette, and Leonard A. Watson, New York City, Mason Kolehmainen,

Rathburn & Wyss, of Chicago, Ill., of counsel), for appellee.

Before MAJOR, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

Patent No. 2,208,374, entitled "Television Receiving System," was issued to H. M. Lewis July 16, 1940. Hazeltine Research, Inc. (hereinafter referred to as Hazeltine), assignee of said patent, brought the instant suit against Admiral Corporation (hereinafter referred to as Admiral), charging infringement of claims 1, 2 and 4. The patent, and particularly the claims relied upon, is directed to a portion of a television broadcast receiver. Admiral counterclaimed for a declaratory judgment of invalidity, non-infringement and non-enforcibility because of misuse by Hazeltine.

The District Court entered Findings of Fact and Conclusions of Law, finding the claims in suit valid and infringed by television receivers made and sold by Admiral. Predicated thereon, the court on September 22, 1949 entered judgment enjoining Admiral from further infringement, awarding damages and costs to Hazeltine and dismissing Admiral's counterclaim. From this judgment the appeal comes to this court.

The contested issues, all decided by the trial court adversely to Admiral, are (1) whether the claims in suit are anticipated by and therefore invalid in view of the prior art Vance Patent No. 2,136,810; (2) whether the claims in suit are invalid for want of patentable invention over prior art Willans Patent No. 2,252,746, in view of prior art Poch Patent No. 2,151,149; (3) whether Admiral's accused television receivers infringe the claims in suit (in connection with this issue is Admiral's contention that file wrapper estoppel exonerates it from what might otherwise amount to infringement), and (4) whether the royalty payment and license notice provisions of Hazeltine's standard form of license agreement constitutes misuse such as to preclude the enforcement of the patent in suit.

At the inception, we are met with the charge frequently made, particularly in patent cases but seldom demonstrated, that the findings of the trial court are entitled to little if any weight. Numerous complaints are registered relative to the manner and means employed by the court in the adoption of its findings. These complaints need no detailed consideration. They evidently are designed, without the frankness to so state, to have us believe that the trial court as a result of its ignorance, carelessness or negligence, permitted a hoax to be perpetrated upon it by counsel for the prevailing party. This insinuation is without justification. The record discloses that the findings were made after three full days of trial, during which testimony was given both by expert and fact witnesses, and after both parties had submitted briefs and oral argument. True, it appears that the findings were drafted by counsel for Hazeltine. But such practice is common and has been many times upheld. Taylor Instrument Companies v. Fee & Stemwedel, Inc., 7 Cir., 129 F.2d 156, 160; Saco-Lowell Shops et al. v. Reynolds et al., 4 Cir., 141 F.2d 587; Schilling et al. v. Schwitzer-Cummins Co., 79 U.S.App.D.C. 20, 142 F.2d 82, 83.

Obviously, this attack upon the court's findings is designed to escape the force of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the relevant part of which provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." And it may be noted, in response to Admiral's argument that this court is as competent as the District Court to weigh the conflicting testimony of expert witnesses, that the rule makes no such distinction and we know of no reason why it should. In fact, the Supreme Court in the recent case of Graver Tank & Mfg. Co., Inc. et al. v. Linde Air Products Co., 336 U.S. 271, 274, 69 S.Ct. 535, 537, 93 L.Ed. 672, referring to this rule stated, "To no type of case is this last clause more appropriately applicable than to the one before us, where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations."

This case is briefed and argued here as though it were a *nisi prius* proceeding. While this practice is not limited to patent cases, it appears most prevalent in this field of litigation. We are thus prompted to make some observations relative to our function as a reviewing court. In doing so, we think it apparent that there has been a tendency to place the review of patent cases in a category different from other cases. This tendency, we suspect, has developed in large part from the uncertainty and confusion heretofore existing as to whether the answer to the question of patentable invention or infringement is to be characterized as a Finding of Fact or a Conclusion of Law. Obviously, if the answer is treated as a Finding of Fact, it comes within Rule 52(a) and is binding upon this court "unless clearly erroneous."

This confusion and uncertainty as to what constitutes a Finding of Fact in a patent case has been laid to rest by the Supreme Court in Graver Tank & Mfg. Co., Inc. et al. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672. (See also the decision in the same case on rehearing, 70 S.Ct. 854.) There, the court, concerning the findings that certain claims were valid, 336 U.S. on page 275, 69 S.Ct. at page 537, 93 L.Ed. 672 stated: "The rule [52(a)] requires that an appellate court make allowance for the advantages possessed by the trial court in appraising the significance of conflicting testimony and reverse only 'clearly erroneous' findings", and concluded that the findings "are manifestly supported by substantial evidence." And as to the findings of the trial court that certain of the claims were invalid, the Supreme Court stated 336 U.S. at page 279, 69 S.Ct. at page 539, 93 L.Ed. 672: "The same deference is due to the findings of the trial court which overturn claims as to those which sustain them. * * * But the record in this case, while not establishing to a certainty that the findings are right, fall far short of convincing us that they are clearly erroneous."

A rehearing was allowed in the case under discussion upon the question of infringement of the claims the validity of which the court had previously sustained.

Related to the issue of infringement was the applicability of the doctrine of equivalence. In a decision rendered May 29, 1950, 70 S.Ct. 854, 857, the court stated (page 4, slip opinion): "A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous."

■ Thus, there is no room longer to doubt that the issues most prevalent in patent litigation, and particularly those of validity or invalidity, infringement or non-infringement, are issues of fact and that a finding by the trial court on such issues is within the terms of Rule 52(a), which a court of review is not at liberty to set aside unless "clearly erroneous." Thus, factual issues in a patent case must be tried and decided by the trial judge in precisely the same manner as those in any other kind of a law suit, and the function of this court on review is no different than that in any other kind of a case.

Turning now to the contested issues, we shall first consider Admiral's charge that there has been such a misuse of patents by Hazeltine as to bar the enforcement of the patent in suit against Admiral. There are two provisions of Hazeltine's license agreements principally relied upon in this respect, namely, (1) the exaction of royalty on entirely unpatented products made by plaintiff's licensees, and (2) the requirement that each licensee mark all his products, whether patented or unpatented, with a notice restricting the uses to which a purchaser may put those products.

■ This misuse issue, predicated upon the same grounds asserted here, was made against Hazeltine and decided in its favor by the First Circuit. Automatic Radio Mfg. Co., Inc. v. Hazeltine Research, Inc., 176 F.2d 799. Certiorari was allowed by the

Supreme Court in the Automatic Radio case, which was pending at the time of the oral argument in the instant case. Subsequently and on June 5, 1950, the Supreme Court rendered its decision in said case, No. 455, Automatic Radio Mfg. Co., Inc. v. Hazeltine Research, Inc., 70 S.Ct. 894. The Supreme Court held that the royalty provision of the license agreement did not constitute a misuse by Hazeltine. As to the asserted illegal license notice, the court found there had been a waiver by Hazeltine of the requirements of such notice and concluded that the question of its legality was not properly before the court. In the instant case, there is no proof of waiver. However, as stated, this issue was decided in Hazeltine's favor by the court of the First Circuit in the Automatic Radio case, and we agree with the result there reached. Moreover, we think that Hazeltine's position on this issue is supported by General Talking Pictures Corp. v. Western Electric Co. et al., 304 U.S. 175, 58 S.Ct. 849, 82 L. Ed. 1273; Id., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81. It is, therefore, our conclusion that the misuse charge made by Admiral must be rejected.

The patent in suit is directed to a small but important feature of television broadcast receivers. The broadcasting of television programs to such receivers involves the radiation from a broadcasting station of a high-frequency radio wave, called the carrier wave, on which is super-imposed or modulated the lower-frequency electrical signal representing the images of a particular program.

In a television broadcasting system the image to be transmitted is subjected to a series of repetitive analyses or scannings at the transmitter and these successive scannings are repetitively synthesized at the picture tube of the receiver. The frequency of repetition of these scannings is sufficiently high that, due to the persistence of human vision, the series of repetitive scannings appear at the receiver as a continuous image, substantially free from flicker. This process is quite analogous to the projection of motion pictures at a frequency of twenty-four images per second to produce the illusion of a continuous picture.

As explained by Professor Hazeltine, plaintiff's expert witness, the analysis of the image at the transmitter and the correlative synthesis at the receiver are effected by cathode-ray tubes. Such a tube develops an extremely fine pencil or beam of electrons, known as a cathode ray, which is deflected back and forth across the face of the tube. The result of such a scanning at the transmitter is to develop a feeble electrical signal varying in amplitude from instant to instant in accordance with variations in the light and shade values of successive elemental portions of the image. This signal is amplified, impressed upon a high-frequency carrier wave and radiated by the transmitter antenna.

At the television receiver the broadcast high-frequency carrier wave is picked up by the antenna as an extremely feeble electrical signal of the order of 100 micro-volts (1/10,000 volt) and is amplified enormously in the receiver to a strength of the order of 50 volts. During this amplifying process, the lower-frequency signal representative of the image is also unscrambled or detected from the high-frequency carrier wave and this amplified detection signal is utilized to vary the intensity of the cathode-ray beam of the picture tube as it is deflected across the face of the tube to reconstruct or paint the transmitted image.

An important and at the same time troublesome feature of a satisfactory television system is what is known as synchronization, that is, keeping the scanning of the image at the transmitter and the scanning of the picture tube at the receiver in step or in gear. This synchronization is effected by sending out a synchronizing pulse at the end of each scanning line and a different type of pulse at the end of each series of lines, called a field. At the receiver, these synchronizing pulses are separated from the image or video signals and utilized to trigger or control generators of scanning waves which cause the cathode-ray beam to scan the face of the tube in step with the scanning at the transmitter tube.

Another important problem in television transmission and reception is that of maintaining the correct relation between the average brightness or background illumination of the image being transmitted and the average brightness of the image being reproduced at the receiver. The variations of image brightness from element to element are represented by a range of signal frequencies up to several megacycles (millions of cycles). This range of frequency must be transmitted in order to provide acceptable definition of the image at the receiver. On the other hand, the component of the signal which represents the background illumination has a steady or very slowly varying value which is termed the direct-current ("d. c.") component of the image signal. It so happens that amplifiers which are suitable for amplifying the wide range of frequencies included in the image signals, do not pass the d. c. component representative of the background illumination. Therefore, it has become customary to discard this direct-current component during the amplifying process so that it is necessary to recover or restore this d. c. component to the signal as it is impressed upon the cathode-ray tube at the receiver.

Plaintiff in its brief states that the patent in suit "is directed to a simplified apparatus for solving these two problems, that is, synchronizing signal separation and d. c. restoration. Lewis did not broadly invent apparatus to solve either of these problems separately. This had previously been done by others, including certain of the patentees of the patents urged in defense by Admiral. What Lewis invented was a novel and extremely simple apparatus for simultaneously performing *both* of these functions."

The Lewis disclosure is summarized in Finding No. 6 as follows:

"6. In brief, the Lewis invention described and claimed in patent 2,208,374 comprises a combined sync signal separator and d. c. restorer for a television receiver including the following essential elements, the appended references being to the patent drawing:

"(a) A signal-translating stage, such as a cathode-ray signal-reproducing or picture tube (cathode-ray tube 17).

"(b) A diode (two electrode) rectifier coupled directly to the input circuit of the stage, i. e., the input circuit of the picture tube, for deriving from an applied video signal a bias voltage proportional to the peak value of the signal (diode rectifier 36 and associated load resistor 29 across which the specified bias voltage is developed).

"(c) A source of constant bias voltage (battery 39 or equivalent).

"(d) A background-illumination control circuit connected to respond jointly to the bias voltage derived from the rectifier and the constant bias voltage (the circuit specified may be traced from the grid 21 of picture tube 17, through resistor 29 and battery 39 to ground, and thence from ground to the cathode 20 of the picture tube and the cathode-grid space of that tube).

"(e) Impedance means, such as a resistor, connected in circuit with the rectifier for deriving from the applied signal pulses corresponding to the synchronizing pulses (resistor 37 interposed between the anode of the diode rectifier 36 and ground and across which sync pulses are developed).

"(f) A scanning synchronizing circuit connected to utilize the synchronizing signals derived by the impedance means (the circuit leading from the top of resistor 37 through condenser 41 to the vacuum tube 40 which amplifies the separated sync signals)."

The Findings of Fact and Conclusions of Law as made by the District Court are reported, 87 F.Supp. 72, and no good purpose could be served in extensive repetition. The court found the claims in suit valid and infringed. Three prior art patents were there, as here, relied upon by Admiral in support of its contention as to non-validity, namely, Vance No. 2,136,810, Willans No. 2,252,746, and Poch No. 2,151,149. It is admitted that Vance is the most pertinent prior art and it is argued that it is a direct anticipation of Lewis. It is also urged that Lewis is invalid for

want of patentable invention over Willans, in view of Poch. The court specifically found that the claims in suit were not anticipated by Vance (Finding 9(a)), and sustained their validity over Willans and Poch (Finding 9(b) and (c)). We have diligently studied the testimony, particularly that of the expert witnesses presented by the respective parties, and have attempted, without too much success we fear, to comprehend its complicated and technical nature. No good purpose could be served in a narration of the testimony in view of the restriction placed upon the right of a reviewing court to exercise its independent judgment. It is sufficient that after a study of the testimony we are not able to say that the findings of the trial court that the claims in suit are valid are "clearly erroneous." Especially is this so when we accord to the claims the presumption of validity which attaches to their allowance.

Claim 1 of the three claims in suit is said to be typical. It reads: "A television signal-receiving system for reproducing a signal including combined picture components and synchronizing components having amplitude values outside the amplitude range of the picture components, the background illumination being represented by the peak value of the signal on one side of its zero axis, comprising a source of bias voltage, *a signal-translating stage having an input circuit to which said signal is applied,* a diode rectifier *coupled directly to said input circuit* for deriving from said signal a bias voltage proportional to said peak value of said signal, impedance means in circuit with said rectifier for deriving from said signal impulses corresponding to said synchronizing components, means for utilizing said synchronizing impulses for synchronizing the scanning operation of the system, and means responsive jointly to said bias voltages for controlling the background illumination of the signal translated by said stage." The language of the claim which we have italicized was added by amendment October 10, 1939, and the other claims in suit were similarly amended. It was only after such amendment, and as a result thereof, that the claims were allowed.

Admiral in much detail sets forth the proceedings in the Patent Office on the Lewis application. The purpose, as we understand, is to demonstrate the limited nature of the claims. It is true that Lewis travelled a rugged road in the prosecution of his application, as is evidenced by the numerous times his proposed claims were rejected by the Examiner over the prior art, particularly Vance, and, as noted, it was not until the amendment of October 10, 1939 (see italicized portion of claim 1 above) that he succeeded in convincing the Examiner that his claims should be allowed.

We think it not open to dispute but that the scope of the claims must be limited to the matter contained in the amendments by which their allowance was obtained, and that Hazeltine is estopped from contending for a broader construction. But, as we understand, Hazeltine does not contend for a construction broader or beyond the scope of the matter included in the amendment. In other words, the direct coupling between the diode rectifier and the picture tube as called for by the amendment is the essence of the invention. And, as noted, it was by this apparatus that Lewis was enabled to perform simultaneously synchronizing signal separation and d. c. restoration. In view of this premise upon which the claims were allowed and the theory upon which the case was tried and decided, the history of the proceedings in the Patent Office is without appreciable significance.

On the issue of infringement, as we understand, Admiral's position is bottomed in the main upon the assertion that in its apparatus the diode rectifier is not coupled directly to the input circuit of its picture tube, and the controversy on this score revolves around the interpretation to be placed upon the words "coupled directly" as employed in the Lewis claims. Admiral contends that it, like Vance, includes a resistor element between the restorer diode and the picture tube grid while the Lewis circuit does not do so, and that, therefore, the Admiral circuit is like Vance and not Lewis. According to the testimony of Hazeltine's expert, however, the presence

or absence of this resistor is completely immaterial to the d. c. restoring and sync separating action of the circuit. Furthermore, this witness testified that the presence or absence of the resistor is immaterial in construing the term "coupled directly" in the Lewis claims. True, Admiral's expert testified to the contrary. On this point the trial court found:

"15. Defendant contends that it escapes infringement by the addition of a resistor in the connection between the d. c. restorer diode and the picture tube grid, but this defense fails because the evidence shows that the presence or absence of this resistor is immaterial to the action of the circuit as a sync separator and d. c. restorer and that its presence does not preclude a direct coupling."

Admiral also argues that both the Vance and Admiral circuits, unlike that of Lewis, have a separate path for conducting the video signal from the video amplifier to the picture tube and that, therefore, the Lewis claims cannot be construed to cover the Admiral circuit. Again the expert witnesses disagreed. According to the testimony of Hazeltine's expert, this distinction sought to be drawn by Admiral is immaterial to the issue involved. In this respect, the court found:

"18. Admiral further asserts that it avoids infringement because each of its receivers includes separate paths for conducting the video signal to the picture tube and to the diode sync separator and d. c. restorer. However, this difference represents an improvement following the Lewis invention and is described and claimed in patent 2,240,281 to Ballard, owned by RCA under whose patents Defendant is licensed. This difference does not affect, and therefore is not relevant to, the diode sync separator and d. c. restorer in issue and does not avoid infringement."

The court also found (Finding 13) that Admiral's apparatus "operates on the same principles and produces the same results as that described and claimed in the Lewis patent," and that (Finding 14) "Such differences as exist between the combined sync separator and d. c. restorer circuit of each of Defendant's Models * * * television receivers and that of Lewis are trivial; that is, they do not effect the operation of the circuit as a sync separator and d. c. restorer or they represent features not associated with the sync separating and d. c. restoring functions of the circuit."

The court made other findings on issues relative to infringement, all adverse to Admiral, which we think unnecessary to repeat. See Findings 16, 17 and 19, 87 F. Supp. 72, 77. In fact, the court found (Finding 19) that each of the claims in suit read in terms, element for element, on Admiral's circuit.

True, the testimony on numerous of the issues involved was of a highly controversial nature, but we are convinced that each of the findings is substantially supported. At any rate, we cannot say that they are "clearly erroneous."

The judgment is affirmed.