SIMMONS COMPANY, Plaintiff-Appellant,

v.

A. BRANDWEIN & CO., Defendant-Appellee,

and

The Seng Company, Intervenor-Defendant-Appellee.

No. 11795.

United States Court of Appeals Seventh Circuit.

Nov. 25, 1957.

Francis A. Even, Cyril A. Soans, Soans, Anderson, Luedeka & Fitch, Chicago, Ill., for appellant.

John W. Hill, Bradford Wiles, Bernard A. Schroeder, Chicago, Ill., for appellees.

Before MAJOR, LINDLEY and SCHNACKENBERG, Circuit Judges.

MAJOR, Circuit Judge.

Plaintiff, Simmons Company, instituted this action against defendant, A. Brandwein & Co., for infringement of Patent No. 2,595,038, entitled "Sofa Bed," issued to Edward E. Woller April 29, 1952, and later assigned to plaintiff. The alleged infringement resulted from the incorporation into sofa beds manufactured by Brandwein of a particular folding bed construction known in the trade as the "Seng Construction," manufactured by The Seng Company. The latter company intervened as a party-defendant and conducted the defense for both parties.

The patent issued with five claims but infringement is charged only as to claims 3, 4 and 5. The usual defenses of invalidity and non-infringement were interposed. The trial lasted six days, during which each side offered the testimony of an expert witness. Plaintiff's expert, Mr. Clarence T. Fishleigh, was an experienced consulting engineer, while defendant's expert, Mr. Kent W. Wonnell, had wide engineering experience and, in addition, was a practicing patent attorney.

A study of their testimony is convincing as to their qualifications although, as might be expected, they were in sharp conflict on important factors of the case. Many exhibits were introduced, including drawings, diagrams and photographs of the patented and accused structures and also of numerous prior art patents relied upon by defendants. In addition, several physical structures were offered, asserted to embody the teachings of the patent in suit, certain prior art patents and defendants' alleged infringing structure.

These exhibits were explained in great detail by the expert witnesses.

As is common practice, the court requested each side to submit proposed findings of fact and conclusions of law. This was done and the court accepted and adopted those submitted by defendants. The court found and concluded that the claims were invalid but that, if valid, they were not infringed by defendants. Upon this premise judgment was entered in favor of defendants, from which plaintiff appeals.

The ultimate issues for decision, of course, are those of validity and infringement. The District Court found invalidity in view of the prior art and also on the basis that the claims failed to comply with the statutory requirement that an applicant must particularly point out and distinctly claim the subject matter which he regards as his invention. The court found non-infringement because of lack of identity of invention, as that rule is enunciated in Electric Railroad Signal Co. v. Hall Railway Signal Co., 114 U.S. 87, 96, 5 S.Ct. 1069, 29 L.Ed. 96. In this connection the court found that plaintiff was estopped from invoking the doctrine of equivalents in view of the proceedings in the Patent Office. Furthermore, plaintiff contends that the court committed error in its refusal to admit in evidence certain patent applications filed by defendant Seng which assertedly embody the structure charged in this case to infringe. It is claimed these applications were relevant in rebuttal of defendants' reliance upon the prior art.

The prior art of sofa beds is voluminous. Defendants in their answer cite fourteen prior art patents asserted to be pertinent. In addition, other prior art patents were relied upon at the trial. Both plaintiff and defendants, particularly defendant Seng, have made generous contributions to the art. Plaintiff is nationally known for its well advertised "Beauty Rest" mattresses and began the manufacture and sale of sofa beds under the trademark "Hide-A-Bed" about 1940. It makes an upholstered unit in its factory which it sells, complete with mattress, to furniture dealers. Defendant Brandwein builds sofa bed frames and installs in them the accused foldable bed bottoms which it purchases from Seng. It also upholsters the unit and includes a mattress in the structure which it sells to furniture dealers for the retail trade. Seng has been in business since 1910. Prior to World War I, it made and sold over 200,000 sofa beds, and by the time Simmons entered the field in 1940, Seng had sold over five million sofa beds. It has owned or has been licensed under as many as 250 sofa bed patents at one time. Between 1946 and the date of trial, plaintiff sold in the United States over 1,150,000 sofa beds.

The patent in suit in its specifications recognizes that it is not a pioneer in the field but that it only represents an improvement over that which preceded it. The specifications state:

"This invention relates to sofa beds of the general type which includes a foldable bed bottom comprising a plurality of interconnected hinged sections which may be extended in horizontal alinement to form a bed or folded to form a sofa seat as disclosed in my Patent No. 2,352,989, issued July 4, 1944."

The patentee, referring to his previous patent, states:

"In such constructions, the outer or foot section of the bed bottom is foldable over an intermediate section to form the sofa seat while the inner or head section is movable into vertical position in a compartment behind the stationary back of the sofa.

"One of the objectionable features of bed davenports heretofore in common use has been the excessive height of the seat when a bed mattress of standard thickness was used. When attempts were made to lower the seat in folded position, the sections when extended to bed position were positioned too close to the floor."

The objects of the invention are stated:

"The main objects of this invention are to provide a sofa bed having improved mechanism for supporting and interconnecting the bed sections whereby they are positioned at comfortable heights for use as a seat or as a bed; to provide a sofa bed of this kind which will accommodate a full-sized mattress of standard thickness; to provide improved locking means for holding the outer or seat section in folded position overlying the intermediate section when the bed is closed to form a sofa; and to provide a sofa bed of this type which may be quickly and easily converted to either bed or sofa position."

Plaintiff in its brief describes its conception of the combination which includes the invention of the patent in suit, its manner of operation and the result achieved. While the description is in some respects argumentative and in others disputed by defendants, we think it is sufficiently accurate to justify its utilization. The brief states:

"The bed bottom of the Woller sofa bed comprises four foldable sections which include, from the outer end inwardly in bed position (Figs. 1 and 2), an outer or foot section 6, a short intermediate or fold section 5, a long intermediate section 4, and an inner or head section 3. The head section 3 is connected to the stationary sofa frame by means of two links 20 and 21, and the long intermediate section 4 is connected to the stationary frame by means of a single link 40. These links support those two sections in the bed position and in the sofa position, and guide and control their movements through fixed paths between those two positions. In the bed position, the foldable bed bottom is also supported by two foldable legs which are not themselves important to the invention and may be disregarded.

"The bed bottom is folded from bed position to sofa position (and vice versa) in two steps or movements. In the first step of the *folding* movement, the outer or foot section 6 is grasped at its outer end and folded over inwardly to an inverted position overlying the long intermediate section 4, and spaced therefrom at the front by the fold section 5. In this first step, the mattress and any included bedding are folded, and lie doubled between the two superposed sections. The second step of the folding movement is commenced by regrasping the front end of the partially folded bed bottom, lifting it, pushing it rearwardly and then downwardly into sofa position. The linkage connections between the two innermost sections and the sofa frame are such as to forcibly cause these two sections to fold into a right angular relationship about midway through the second step or movement. Thereafter, during the balance of the second step or movement, the bed bottom, fully folded, rocks into sofa position on the frame.

"In the folded sofa condition, the successive sections are disposed at right angles to each other. The head section 3 extends vertically downwardly from its compartment behind the fixed back rest, the long intermediate section 4 extends forwardly horizontally from the bottom of the head section, the short fold section 5 extends vertically upwardly from the front end of the long intermediate section, and the foot section 6 extends horizontally rearwardly from the upper end of the short fold section, with its free end extending beneath the fixed back rest of the sofa frame.

"In this arrangement, the expansive force of the mattress and bedding, folded double beneath the seat, is overcome, and the foot section is pulled down, and locked in proper position to serve as a sofa seat, by linkage carried on the bed bottom itself, and deriving its operation from the earlier described folding movement. This arrangement includes, in addition to some of the parts already described, a number of additional links which are placed in potentially operative position by the first step of the folding movement, and then actuated automatically by the second step of the folding movement to pull the foot sec-

tion down into seat position, compressing the mattress and bedding between the two superposed sections.

"Inasmuch as the actuation of the compression mechanism is derived from the forced folding of the two innermost sections of the bed bottom, the compression is complete when those two sections are fully folded. This occurs about midway through the second step, and in ample time for the free end of the foot section to be pulled down sufficiently to pass without obstruction beneath the fixed back rest of the sofa, as the bed bottom then rocks, fully folded, into sofa position.

"Specifically, in the patented sofa bed there is a link 30 which spans the joint between the foot section 6 and the short fold section 5, and a second link 50 which spans the joint between the short fold section 5 and the long intermediate section 4. During the first step of the folding movement these two links are moved to positions across the angles formed between the three outermost sections at the end of the first folding movement. In this position, the link 30 serves to lock together, in right angular relationship, the foot section 6 and the short fold section 5 (see Fig. 5). It will be apparent, therefore, that a rearward pull on the link 50 will tend to draw the short fold section 5 rearwardly upon its pivot, and that the foot section 6, being locked to the short fold section 5 by the link 30, will be drawn downwardly to compress the mattress and bedding. During the first movement, however, the link 50 has not been pulled upon, and it is possible to freely unfold the foot section to the bed position.

"The link 50 is provided at its inner end with a pin 52, disposed within a slot 53 in the long intermediate section 4 (Figs. 3 and 4), and also in a slot 57 in a link 54. The slot 57 in the link 54 has in its upper edge a hook 58 which, during the second step of the folding movement, grasps the pin 52 on the link 50 to draw the same rearwardly in its slot 53 in the long intermediate section 4. At its inner end, the link 54 is pivotally connected to the head section 3 at a point spaced beneath the pivotal connection 24 between the two innermost sections. It will be apparent that as the two innermost sections 3 and 4 are forcibly folded during the second step of the folding movement, the offset attachment of the inner end of the link 54 to the head section 3 causes the link to be drawn rearwardly along the side of the long intermediate section 4. This brings the hook 58 into engagement with the pin 52 on the link 50, and draws it rearwardly.

"As already explained, this pulls the short fold section 5 to the rear and causes the foot section 6 to be swung downwardly to compress the mattress and bedding. The full compression of the mattress is attained in the position of Figure 7, after which the bed sections, when fully folded, rock into the seat position, Figure 8."

Claim 3, in most respects typical, with its elements numbered, is as follows:

"(1) A sofa bed structure which comprises a normally stationary frame and (2) a bed bottom comprising a plurality of foldable sections including two sections having (3) means hingedly connecting said two sections whereby said two sections are relatively foldable with one of the two sections overlying the other, (4) mounting means movably supporting said plurality of sections on said frame whereby said sections when folded are movable inwardly of said frame with one of said two sections uppermost to form a sofa seat, (5) means interconnecting and carried by said two sections for drawing said two sections toward each other, and (6) means carried by one of the plurality of sections and releasably engageable with said interconnecting means by the movement of said foldable sections relative to the frame when the foldable sections are moved inwardly toward said frame."

Claim 4 is identical with claim 3 in all but the sixth element, which describes a link having a "lost motion" connection with the "interconnecting means" of the fifth element of claim 3. Claim 5 states that the "interconnecting means" (fifth element of claim 3) includes a "member connected with the upper of said two sections and having thereon a pin" and that the "releasably engageable" means (sixth element of claim 3) has its releasable engagement with that pin.

We think it is conceded, certainly it is hardly open to question, that elements 1, 2, 3 and 4 are disclosed by prior art patents and found in numerous of the structures manufactured prior to the time of plaintiff's asserted invention. Such being the case, patentable invention, if such there be, must reside in elements 5 and 6, which describe the "means" for achieving the intended result. Plaintiff asserts that the fifth element or "interconnecting means" shown in the patent structure includes (a) the link 30, which serves to lock the foot section 6 to the short fold section 5, (b) the section 5 itself, and (c) the link 50, which pulls upon the section 5, and through the link 30 upon the foot section 6, to pull the foot section down to compress the mattress and bedding. Further, plaintiff asserts that the sixth element of the claimed combination, the "releasably engageable" means, as found in the patented structure, is the link 54 provided at its outer end with a slot 57 having in its upper edge the notch or hook 58 which is disposed to grasp the pin 52 on the link 50. The link 54 at its inner end is connected to the head section 3, so that as the two innermost sections fold relative to one another, during the second step of the folding movement, the link 54 is pulled rearwardly. During this rearward movement the hook 58 in the link 54 grasps the pin 52 on the link 50, pulling the same rearwardly and pulling the foot section down.

The District Court, after stating in its findings, "A number of prior art patents were explained by expert witnesses on both sides," made detailed findings relative to the teachings and mechanism disclosed by a number of such patents, including Dyke Patent No. 1,081,590; Davis Patent No. 1,120,911; Andren Patent No. 1,155,779; De-Does Patent No. 1,210,432; Kindle Patent No. 1,270,742; the previous Woller Patent No. 2,352,989, owned and used by plaintiff; Thomas Patent No. 2,007,988, and Bayer Patent No. 2,333,087. The findings relative to these prior art patents are concerned directly with the issue of validity and also bear upon the non-infringement defense "of lack of identity of invention." A mere recitation of these findings would unduly prolong this opinion and could serve no useful purpose. We have given careful consideration to the contentions pro and con regarding such findings together with the evidence, oral and documentary, and come to the conclusion that they are justified by the record. Certainly we are not prepared to hold that they are "clearly erroneous" under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Plaintiff apparently ignores this rule applicable upon appellate review and argues that the findings are "contrary to the weight of the evidence." A statement by the Supreme Court in Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 336 U.S. 271, 274, 69 S.Ct. 535, 537, 93 L.Ed. 672, particularly applicable to the instant situation, bears repetition. After quoting the pertinent portion of Rule 52(a), the court stated:

"To no type of case is this last clause more appropriately applicable than to the one before us, where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations. * * *

"The rule requires that an appellate court make allowance for the advantages possessed by the trial court in appraising the significance of conflicting testimony and reverse only 'clearly erroneous' findings."

The court was speaking of findings as they relate to the issues of both validity

and infringement. Also see the opinion of this court in Hazeltine Research, Inc., v. Admiral Corp., 7 Cir., 183 F.2d 953, 954.

Notwithstanding our statement relative to the findings as they concern the prior art patents, there are three entitled to more than passing consideration, namely, Thomas No. 2,007,988, Bayer No. 2,333,087 and Woller No. 2,352,989. The Thomas patent was not cited in the Patent Office against the patent in suit. The Bayer and Woller patents were both owned and utilized by plaintiff.

The District Court, in finding 25 describes the disclosure of Thomas, particularly regarding its linking mechanism. This finding is supported by the testimony of defendants' expert witness and is not subject to serious attack. The main attack is upon finding 26, which states:

"Claims 3, 4 and 5 of the Woller patent in suit only distinguish from Thomas by reciting a 'lost motion' connection or that the means is 'releasably engageable' with the interconnecting means or the pin. Pin-and-slot connections are extremely old in the sofa bed art, and no invention was required to add such connections to Thomas so that the bed may be folded up in two movements rather than in one continuous movement as taught by Thomas. For these reasons the claims are invalid for lack of invention over Thomas."

Finding 28 states:

"Bayer patent 2,333,087 shows all the mechanism of the Woller patent in suit except the link mechanism for urging the top bed section downwardly in sofa position. It would not require invention to adapt the linkage of Thomas patent 2,007,988 to the sofa bed structure of Bayer."

Finding 29 states:

"Woller patent 2,352,989 issued to the same inventor as the patent in suit. In the final movement to sofa position in this earlier patent, the top bed section is urged downwardly by engagement with the front edge of a plate 53 on the sofa frame to hold the structure in seat position against roller 96. It would not require invention to substitute the drawing linkage of Thomas patent 2,007,988 in the structure of patent 2,352,989 and therefore claims 3, 4 and 5 of the patent in suit are invalid."

Whether the changes in the mechanical means thus disclosed rise to the dignity of patentable invention or are within the domain of the skilled mechanic must be resolved in the first instance by the trial judge. Obviously, some other judge of equal versatility might reach an opposite conclusion. It is possible that this court, if the trier of the facts, might do so. The trial court, however, occupying a position of advantage in appraising the situation and charged with the responsibility of so doing, found adversely to plaintiff's contention. While the question as to the validity of the findings invalidating the claims in suit in view of the prior art is not free from all doubt, we certainly are not convinced that such findings are clearly erroneous. As the Supreme Court stated in Graver Tank & Mfg. Co., supra, 336 U.S. at page 279, 69 S. Ct. at page 540:

"But the record in this case, while not establishing to a certainty that the findings are right, fall far short of convincing us that they are clearly erroneous."

Plaintiff, as might be expected, makes a strenuous effort to overcome the teachings of the Thomas patent. That it was familiar with this patent is evident from the fact that in 1940 it was charged with its infringement. That suit was brought by the patentee Thomas and Pullman Couch Company. The trial court, without passing upon the issue of validity, found there was no infringement and dismissed the complaint. On appeal, this court affirmed. Thomas v. Simmons Co., 7 Cir., 126 F.2d 743. De-

fendants' present expert, Wonnell, was attorney for Thomas in the procurement of his patent and presumably was thoroughly familiar with its teachings. Defendants in the instant case rely upon the disclosure shown in figures 6 and 7 of Thomas, which were not involved in the previous litigation. Plaintiff attempts to discredit this reliance mainly on the basis that there was no commercial use made of the structure disclosed by figures 6 and 7, and, more importantly, that any structure made in accordance therewith would be inoperative. On this basis it is argued that the disclosures made by the drawings cannot be relied upon. Plaintiff, to show inoperativeness, introduced two exhibits, Nos. 17 and 18, each purporting to be a scale model of the Thomas linkage as shown in figures 6 and 7. They indicate that the structure of figure 6 of Thomas cannot be folded to the sofa position and that the structure of figure 7 cannot be unfolded to bed position.

Defendants' expert testified that the mechanism shown by figures 6 and 7 of Thomas was operable. Plaintiff's models, as well as the testimony of its expert, were based upon ex-parte tests and were offered in rebuttal. On surrebuttal, defendants' expert identified photographs of a working skeleton model of figures 6 and 7 of Thomas, which had been produced in the previous litigation. Plaintiff's expert admitted on cross-examination that he had made a model like the photographs and that it worked better than plaintiff's ex-parte models. The District Court found, "A man skilled in this art could make an operative device from the teachings of the Thomas patent and it is effective as a reference against the validity of the Woller patent in suit." We think the record supports this finding, particularly when considered in connection with the rule that the issuance of a patent creates a presumption that the structure disclosed is operative. As was stated in Dashiell v. Grosvenor, 162 U.S. 425, 532, 16 S.Ct. 805, 807, 40 L.Ed. 1025:

"The very fact that a machine is patented is some evidence of its operativeness, as well as of its utility, and where a model is constructed after the design shown in a patent which is not perfectly operative, but can be made so by a slight alteration, the inference is, that there was an error in working out the drawings, and not that the patentee deliberately took out a patent for an inoperative device."

Having concluded that we must accept and are bound by the findings of the trial court that the claims in suit are invalid in view of the prior art, we think it unnecessary to discuss or decide another basis upon which the court found invalidity, that is, that the claims are vague, indefinite and uncertain and, therefore, fail to meet the requirements of Title 35 U.S.C.A. § 112.

In view of our affirmance on the finding and conclusion of invalidity, we are in doubt as to the necessity of considering the issue of infringement. It is obvious that there could be no infringement of an invalid patent. The District Court, however, concluded that the claims in suit "if valid, are not infringed by defendants," and dismissed the complaint because of non-infringement as well as invalidity. Even though of doubtful necessity, we shall consider the defense of non-infringement. On this issue the most important exhibit is plaintiff's colored exhibit No. 13, which describes the three claims, broken down in numbered elements. (See claim 3, heretofore described in the same manner.) To the left of the claims thus described is portrayed the patent structure, to the right the accused structure. Lines are drawn from the elements of the claims to the respective structures, which purport to show where the claim elements are found in each.

On this issue as on that of validity, the court made extensive findings, comparing in great detail the patent with the accused structure, particularly the linkage means employed by each. Defendants in

their brief have submitted a side-by-side comparison, element by element, showing important differences between the patent structure in suit and the accused structure. Record citation is given in support of each element of the two structures as stated. As we understand, plaintiff does not dispute but that there is record support for each of the statements made in defendants' submitted comparison. Rather, an attempt is made to minimize the importance of the comparison on the basis that the differences disclosed relate to features which are not called for by the claims in issue, that there is contrary evidence regarding some of the statements and, in effect, that any improvements disclosed by Seng do not, under the doctrine of equivalents, permit it to escape infringement. The comparison thus made by defendants is as follows:

"Woller Patent
2,595,038.

"Gravity operated notched link 30 is essential and must latch the front bed section 6 to the hinge section 5 in intermediate position and sofa position.

"Hinge section 5 is an essential link of the mechanism for drawing the bed sections 4 and 6 together.

"The bed sections are drawn together by a continuous interconnected linkage of slotted link 54 engaging the link 50, through a slot in the bed section 4 so as to pull the hinge section 5 rearwardly, and by the gravity latch 30 urging the front bed section 6 downwardly.

"There is no positive lock. The linkage merely urges the front bed section toward the roller 47.

"The continuous linkage follows the three outer bed sections along the edge of the mattress. It is a rearwardly open U-shaped articulated linkage like a man's arm.

"Only the mattress prevents the front bed section from collapsing onto the intermediate section in intermediate position.

"The inseparable linkage is always interconnected in all positions and necessarily includes two pin-and-slot or 'lost motion connections' at 52 and 34."

"Seng Device.

"There is no corresponding link or latch, and the front bed section is never latched to the hinge section. There are no gravity operated links or latches.

"Hinge section does not draw or lock the bed sections together.

"The actuating link pushes the roll-over lock into locking engagement with a spacing leg depending from the front bed section. Like a window lock, the cam face of the lock may pull the spacing leg into locked position, if necessary.

"The roll-over lock provides a positive locking connection between the front and intermediate bed sections. There can be no up and down movement between them.

"The lock and leg form a closed loop with the three outer bed sections, making a direct positive connection between the front and intermediate bed sections.

"A spacing leg holds the front bed section from collapsing in intermediate position.

"There are no pin-and-slot or 'lost motion connections' in the locking mechanism. The roll-over lock and leg are disconnected in bed position, and a pin-and-slot connection would be entirely impractical."

The District Court in its findings relied heavily upon the non-infringement defense "of lack of identity of invention." The case most relied upon in support of such doctrine is Electric Railroad Signal Co. v. Hall Railway Signal Co., 114 U.S. 87, 96, 5 S.Ct. 1069, 1075, 29 L.Ed. 96, wherein the court stated:

"The thing patented is the particular means devised by the inventor by which that result is attained, leaving it open to any other inventor to accomplish the same result by other means. To constitute identity of invention, and therefore infringement, not only must the result attained be the same, but in case the means used for its attainment is a combination of known elements, the elements combined in both cases must be the same and combined in the same way, so that each element shall perform the same function, provided, however, that the differ-

ences alleged are not merely colorable, according to the rule forbidding the use of known equivalents."

The court made a number of findings pertinent to the defense under discussion but we think the essential differences between the patent and accused structures are embodied in finding 12 as follows:

"Lack of identity of invention is obvious through a comparison of the disclosure of the Woller patent and the structure of the accused Seng device. In Woller the gravity latch 30 must latch the front bed section 6 to the hinge section 5 in the intermediate position and sofa position; in Seng there is no gravity operated link or latch and the front bed section is never latched to the hinge section. Hinge section 5 of Woller is an essential link for drawing the bed sections together; the hinge section of Seng does not draw or lock the bed sections together. Woller's bed sections are drawn together by a continuous interconnected linkage of slotted link 54 engaging the link 51 through a slot in the bed section 4 to pull the hinge section rearwardly and by the gravity latch 30 urging the front bed section 6 downwardly; in Seng the actuating link merely pushes the roll-over lock into locking engagement with a spacing leg depending from the front bed section. Woller has no positive lock and his linkage merely urges the front bed section toward the roller 47; Seng's roll-over lock is a positive connection which permits no up and down movement between the locked bed sections. Woller's continuous linkage follows the three outer bed sections along the edge of the mattress and forms a rearwardly open articulated linkage like a man's arm; Seng's lock and leg form a closed loop with the three outer bed sections. Woller's front bed section will collapse onto the intermediate section in intermediate position unless held up by a mattress; Seng's spacing leg prevents collapse in intermediate position. Woller's inseparable linkage is always interconnected in all positions and requires two pin-and-slot connections at 52 and 34; there are no pin-and-slot or lost motion connections in the Seng device because the roll-over lock and link in Seng must be disconnected in bed position and therefore a pin-and-slot connection could not be used. For these reasons there is no identity of invention and no infringement of Woller's patent."

There is some controversy as to the validity of certain portions of this finding but we think that in essential details it finds adequate support in the record. Some of the main features distinguishing the accused structure are that it has no interconnected linkage mechanism for pulling the front bed sections together, the top bed section is never latched to the hinge section, there are no gravity operated latches, and it has a positive lock. In our view, the court was on solid ground in finding that there was a lack of identity of invention. It cannot be doubted but that the mechanism employed in the accused structure was different from that disclosed by the patent. It functioned in a different manner and obtained an improved result.

Plaintiff argues that the District Court in applying the doctrine of "lack of identity of invention" mistakenly compared the accused structure with plaintiff's commercial structure when the comparison should have been made with the elements of the claims in suit. This argument seems to presuppose that plaintiff's commercial structure embodies something other and different from the teaching of its patent. In any event, any merit in this contention is of no benefit to plaintiff because the court also found that the claims in suit "do not read on the accused Seng device." With this we agree.

■ It is pertinent, of course, to recognize that the principle of "lack of identity of invention" must accommodate itself to another equally well established principle, that is, the "doctrine of equivalents." Such recognition is shown in our previous quotation from Electric Railroad Signal Co. v. Hall Railway Signal Co., supra, [114 U.S. 96, 5 S.Ct. 1075] so strongly relied upon by defendants in support of the court's finding of non-infringement because of "a lack of identity of invention." In our previous quotation from that opinion it is stated, " * * * provided, however, that the differences alleged are not merely colorable, according to the rule forbidding the use of known equivalents." This doctrine has been defined in many cases, applied in some and rejected in others. In Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, the doctrine is described thus:

"The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, Imhaeuser v. Buerk, 101 U.S. 647, 655, 25 L.Ed. 945, although the area of equivalence may vary under the circumstances."

The doctrine, however, is a two-edged sword and does not always operate in favor of the patentee. Sometimes it is used against him, depending upon the circumstances of the case. The court in the Graver case so recognized. It stated (339 U.S. at page 608, 70 S.Ct. at page 856):

"The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement."

■ Such exception may be applicable even though the accused device "falls within the literal words of the claim." In our view, this exception is more pertinent to the instant situation than the general rule. As we have previously stated, the patentee of plaintiff's structure was not a pioneer; he was working in an art that was crowded and highly competitive. The most that can be claimed is that the patent disclosed an improved mechanical linkage for the folding and unfolding of a sofa bed. If a valid patent issued, contrary to what we have held, it must be limited to the precise structure disclosed and claimed. Limitations interposed in order to escape the prior art must be given recognition when infringement is charged.

We have already referred to the case wherein the instant plaintiff was sued for infringement of Thomas patent No. 2,007,988, in which was involved a linkage for converting a davenport into a bed and vice versa. In affirming an adjudication of non-infringement, this court made a statement pertinent to the instant situation (Thomas v. Simmons Co., 126 F.2d 743, 746):

"Much is said here in effect about the injustice of the defeat of appellants' rights under the patent by an accused structure which differs so insignificantly from the patent. We think the difference, regardless of its extent, is not insignificant. To construe the patent more broadly than we have would defeat it. It is not denied that Thomas was working in a very narrow and limited

field. He was accorded his patent upon a very narrow margin, and he can not complain if infringement is denied with reference to a structure which eliminates the very narrow feature upon which the patent is based."

Much controversy revolves around a finding of the trial court that the proceedings in the Patent Office show a file wrapper estoppel which precludes application of the doctrine of equivalents. In view of what we have said, we think there is no reason, certainly no necessity, to decide this issue. As shown, other findings which we accept furnish ample support for the judgment on the ground of non-infringement.

■ This brings us to plaintiff's contention that the court erred in refusing to admit in evidence two applications by defendant Seng pending in the Patent Office upon the structure charged to infringe in the instant case. Over objections by defendants, based upon privilege and irrelevancy, the trial court ordered Seng to permit inspection by plaintiff of the applications which Seng admitted had been filed, subsequent to the issuance of plaintiff's patent, on certain features of the accused structure. Plaintiff inspected such applications and in rebuttal offered them in evidence. The court denied their admission on the ground of irrelevancy, which denial plaintiff asserts was error.

Relative to these applications, the parties entered into a stipulation which provides in part:

"In the event an appeal is taken from the judgment of the District Court, all or any portion of either of said copies which is a part of the record in the District Court shall be transmitted to the United States Court of Appeals in a sealed envelope for examination only by the Court of Appeals, and shall not be designated as a part of the printed record on appeal."

In accordance with the stipulation, copies of Seng's applications have been presented to this court in a sealed envelope. We are urged to examine them, "not only to find that they were improperly excluded, but also to weigh them with respect to the alleged defense that the accused device, insofar as it is comprehended by Woller, is merely a reincarnation of the prior art." The question as to their admissibility is novel and, so far as we are aware, has never been previously presented to this court or, for that matter, to any other court of review.

We have some difficulty in determining the basis for plaintiff's contention that the applications were relevant. While they were offered in rebuttal, no attempt was made during cross-examination of defendants' witnesses to lay any basis for impeachment. Plaintiff in its brief states, " * * * those applications were clearly relevant as negativing the proposition that the accused device is justified by the prior art, or that because of that prior art the Woller claims must be limited to exclude the accused device." And again, "The inconsistency between Defendant's position before the Court, where it urged that the accused device is justified by the prior art, and its position simultaneously taken in the Patent Office, where it contended that the accused device is so significantly different from the prior art as to justify the grant of a patent, should have been recognized by the Court." Plaintiff in the court below stated, "But such inconsistency between contrary positions concurrently maintained does have probative value as showing lack of sincerity in the defenses in question."

Plaintiff's argument appears to be that defendants in the instant case denied infringement on the basis that the accused structure was shown and taught by the prior art, which is inconsistent with the position now taken in the Patent Office that the accused structure amounts to patentable invention over such art. We think this argument rests upon a false premise. At any rate, the case was not decided by the trial court on that basis. As we have already

shown, non-infringement was found, in the main upon "a lack of identity of invention" and from the fact that the claims in suit did not read upon the accused structure. The prior art, dissected in much detail by the trial court, was utilized primarily on the issue of validity. As pointed out, we have affirmed the court's finding of invalidity in view of such art but at the same time have expressed the opinion that the claims in suit, if valid, must be narrowly construed in view of such art. When so considered, defendants' altered and improved structure did not infringe.

Whether Seng's pending applications upon the accused structure justify the award of patents over the prior art is for the Patent Office to determine in the first instance. The validity of the patents, if issued, may furnish the subject matter of another lawsuit with issues which plaintiff apparently would have us resolve at this time. An attempt to do so would take us far afield and the practice, if approved, would convert the trial of a patent case into one of indeterminable duration. In our view, the present position of Seng in the Patent Office, consistent or inconsistent, would have no bearing upon the issues of the instant case.

Plaintiff relies upon a decision of this court, National Slug Rejectors, Inc., v. A. B. T. Mfg. Corporation, 7 Cir., 164 F.2d 333, the only case cited in support of the admissibility of this testimony. There, the defendant in a patent infringement suit filed a counterclaim upon a patent issued to him. The defense of priority of invention admitted the validity of plaintiff's patent. This defense, rejected by the District Court, was affirmed by this court. In this court

defendant admitted the correctness of the holding on the issue of priority and for the first time argued that plaintiff's patent was invalid. It was in this setting that this court, referring to defendant's shift of position, stated (page 338), " * * * [it] carries several adverse deductions, one of which is bad faith and lack of sincerity in its contention of invalidity." Even this statement was dictum and, as the opinion discloses, was irrelevant to the issue which remained for decision, that is, that of validity. The case furnishes no support for plaintiff's contention on the issue under discussion.

In our judgment, there was no error in the ruling of the court denying admission of Seng's pending patent applications. It is ordered that they be returned to plaintiff's counsel.

The judgment is affirmed.

SCHNACKENBERG, Circuit Judge (concurring).

I add two comments.

1. Having disposed of this appeal by holding that the district court was correct in adjudicating that plaintiff's patent claims in suit are invalid, the issue as to infringement thereupon became moot. The latter issue is hypothetical, unless and until we are reversed on the question of validity by the United States Supreme Court, in which contingency we might have to pass upon the issue of infringement.

2. In concurring, my position is based upon the distinctions as to findings of fact and questions of law, arising in patent cases, as outlined in Noble Co. v. C. S. Johnson Co., 7 Cir., 241 F.2d 469, 475–476, where the controlling cases are cited.