**ARMOUR & CO., Plaintiff-Appellant,**

v.

**WILSON & CO., Inc., Defendant-Appellee.**

No. 12595.

United States Court of Appeals
Seventh Circuit.
Jan. 14, 1960.

Casper W. Ooms, Herman Hersh, David L. Ladd, Horace Dawson, Timothy L. Tilton, Chicago, Ill., for appellant.

Roger T. McLean, New York City, R. Howard Goldsmith, Thomas Freeman, Chicago, Ill., for appellee.

---

* While Judge Parkinson participated in the hearing of oral arguments and a conference of the judges above named, he was not present at the time of, and did not participate in, the adoption of this opinion.

Before HASTINGS, Chief Judge, and DUFFY, SCHNACKENBERG, PARKINSON,* KNOCH and CASTLE, Circuit Judges.

DUFFY, Circuit Judge.

Armour brought this suit against Wilson for infringement of Thompson Patent No. 2,669,537 and Bunding Patent No. 2,669,536. The District Court held the Thompson patent invalid, and the Bunding patent invalid but not infringed. If the Thompson patent is valid, Wilson admittedly infringed it. The instant case was tried on defenses relating to the validity of the Thompson patent, and on this appeal we are concerned only with the Thompson patent. Claims I and II of the patent in suit are relied on by Armour.

The first paragraph of the patent in suit, succinctly, if not monosyllabically, describes the patent as follows: "This invention relates to an adrenocorticotrophin preparation suitable for intramuscular or subcutaneous injection and having an enhanced adrenocorticotrophic effect." The product with the jaw-breaking name of adrenocorticotrophin is widely known as ACTH. The patent covers Dr. Thompson's alleged invention of the pharmaceutical combination of gelatin and adrenocorticotrophin (ACTH).

Both Armour and Wilson manufacture and sell gelatin-ACTH preparations which are covered by Claims I and II of the patent. These products also include 0.5% phenol, a standard anti-bacterial agent. Gelatin-ACTH now constitutes more than 80% of all forms of ACTH products sold by Armour and Wilson. Other companies licensed under the Thompson patent also produce similar products.

In a human being, adrenocorticotrophin (ACTH) appears in the anterior lobe of the pituitary gland located at the base of the brain. When the human body is under stress or attacked by cer-

tain diseases, control centers in the brain excite the pituitary, and the pituitary secretes ACTH. In the blood stream the ACTH thus secreted is carried to the adrenal glands situated in the human body above the kidneys. As the ACTH hits the outer wall of the adrenal glands, it stimulates the adrenals to produce a set of chemical substances such as steroids, including the hormones, cortisone and hydrocortisone.

The cortisone hormones then act in the tissues of the body to suppress inflammations and allergic reactions. ACTH thus is used to relieve such conditions as rheumatoid arthritis and allergies. ACTH does not, itself, directly attack disease. However, it stimulates the adrenals which produce more than twenty-eight steroids, and these hormones attack the diseased tissues. When the human body itself does not supply sufficient ACTH, pharmaceutical ACTH can fill the gap.

Medical science has not been able to synthesize ACTH. However, this product suitable for human use can be obtained from the pituitaries of animals including hogs and cattle. Armour and Wilson base their production of ACTH on by-products of their meat-packing operations.

Although medical science knew that ACTH existed prior to 1942–1943, it was not until that time that good assay techniques were developed which facilitated purification. Wilson became interested at that time and obtained a method for preparing the pituitary extract from a Dr. Astwood.[1] Armour had shown an interest in ACTH at an even earlier date. By 1948 Armour had developed an ACTH material suitable for experimentation by clinicians.

In 1949, Dr. Hench and associates at the Mayo Clinic using Armour ACTH, discovered the substance was useful in the treatment of rheumatoid arthritis. The news of these experiments was wide-ly disseminated, and a large scale commercial demand was created far beyond the facilities of the pharmaceutical industry to supply. The cost of animal glands used in the production of ACTH skyrocketed from $7.00 a pound to over $100.00 a pound, and even at that price, the supply was not adequate.

ACTH is destroyed in the human digestive system. Hence, two methods of administration were developed. One was intravenous (injection into the veins) and the other intramuscular or subcutaneous (injection into tissue).

The adrenals operate on a trigger principle in the production of cortisone, hydrocortisone and other steroids. Once the adrenals have been sufficiently stimulated to begin operation, they react fully and produce steroids at their maximum for a short interval. Larger doses of ACTH during that interval will not produce further response in quantity. For reasons not fully understood ACTH cannot survive long in the blood. Any quantity above the trigger amount is quickly destroyed and thus wasted. When injected into the tissues (intramuscular), ACTH, when unprotected, will not survive in muscular tissue any more than in the blood. If ACTH is given in large doses, much of it will not reach the adrenals and is consequently wasted. Dr. Forsham, an expert for plaintiff, testified one unit of ACTH injected intravenously by continuous drip over a period of eight hours produces the same results as forty units injected all at one time.

As ACTH could not be given intravenously in quantities, a method was devised for administering same by intravenous drip. A needle would be inserted in the patient's vein, taped in place, and kept there many hours to permit the ACTH to drip slowly and continuously into the vein. Such a method was cumbersome and necessarily immobilized the patient.

---

1. In 1950 Dr. Astwood developed a procedure which was published, but which he did not patent, for preparing ACTH in a more highly purified form. It is referred to as Astwood ACTH.

Plaintiff says what was needed was an ACTH preparation which could be administered in infrequent injections; would trigger the adrenals quickly into the production of steroids and sustain that production; would provide a maximum action with a minimum amount of ACTH, and would prevent waste of the valuable ACTH. Plaintiff claims the Thompson invention of gelatin-ACTH provided the answer.

Before September, 1949, Dr. Wolfson, a clinical investigator at Michael Reese Hospital, and Dr. Thompson and his associates at Armour, separately sought an ACTH preparation which would overcome the waste of ACTH. Dr. Wolfson tried two approaches which had met with some success in connection with insulin and penicillin, such as insolubilizing the ACTH and combining ACTH with a water repellent (hydrophobic) material. However, these experiments were not successful.

In June, 1949, Dr. Wolfson came to the Wilson laboratories and discussed with Dr. David Klein of Wilson, means to prolong the activity of ACTH. Gelatin was mentioned. On July 26, 1949, Wolfson wrote Dr. Klein and stated: " * * * I have tried a number of expedients to make ACTH with prolonged action, ranging from tannates to protamine-zinc derivatives and including suspending the material in sesame oil. * * * and the non-antigenic gelatin sounds to me to be a considerably better idea. Could you spare some of this material for me to putter with?" Dr. Klein did not send the gelatin until September 12, 1949.

As a part of Armour's crash program, Thompson had been trying to find a retardant for ACTH. He tried insolubilizing the ACTH and combining ACTH with a hydrophobic vehicle. Thompson had given some consideration to gelatin, but at first did not think it promising enough to pursue.

Wolfson believed he had found a long-acting ACTH—a combination of ACTH with aluminum phosphate which insolubilized the ACTH. But this did not prove satisfactory for clinical use. The sharp particles of the aluminum were irritating upon injection into the tissues. Thompson proposed to Wolfson that he add to the aluminum phosphate-ACTH, a viscous medium which would coat the aluminum phosphate particles and overcome local irritation which had thwarted Wolfson's experiments. On September 27, 1949, Wolfson injected an aluminum phosphate preparation with gelatin into a patient named Loidl at Michael Reese Hospital. Plaintiff claims the gelatin used in the Loidl test was supplied by Dr. Thompson. However, the preparation was found to be just as irritating as it was before the gelatin was added. The District Court found that this was the first clinical use of gelatin with ACTH.

Dr. Thompson's notebook reveals an entry under date of October 20, 1949: "Dr. Wolfson suggested combining all the known effective delaying agents, trying the combination clinically, and by elimination, try to arrive at an effective prepartion." The first written entry in the Thompson notebook suggesting the possible use of gelatin and ACTH appears under date of November 22, 1949.

By February, 1950, Dr. Thompson had arrived at a gelatin-ACTH preparation without using aluminum phosphate. First Armour, and a few months later, Wilson, were on the market with gelatin-ACTH. Both of these products included 0.5% phenol.

The District Court held the claims of the Thompson patent in suit invalid for a number of reasons including: 1) because the use of gelatin with ACTH was obvious to those skilled in the art; 2) the claims are invalid for lack of invention over the prior art; 3) because Thompson was not the first and original inventor.

The District Court also held the patent invalid because Armour sold ACTH in gelatin compositions in the fall of 1951, more than one year prior to the filing date of Thompson's continuation-in-part application filed December 27, 1952. The Court held this was a public

use more than one year prior to Thompson's effective filing date.

The District Court found fraud on the part of Thompson in a number of respects. The Court found the Thompson patent was improperly prosecuted by furnishing the Patent Office with false and misleading information and statements. Reliance was placed upon Thompson's report to the Patent Office of the results of a test upon rats. It was also charged that complete disclosure of the claimed invention was "buried in the body of the affidavit and in the graph * * *." Fraud was also charged in that polyvinyl pyrrolydone (PVP-ACTH) was Wolfson's suggestion, but Thompson claimed it as his invention.

It is easy to make charges of fraud, but the law rightfully insists that before legal rights may be based upon such charges, they must be established by clear and convincing evidence. The burden is on the party making charges of fraud to establish same by clear and definite proof.[2] In a patent case it was held that clear and definite proof is required to establish fraud on the part of a patentee in soliciting his patent. Becton-Dickinson & Co. v. Robert P. Scherer Corp., D.C.Mich.1952, 106 F.Supp. 665, affirmed 6 Cir., 211 F.2d 835.

Perhaps the most vigorously argued charge of fraud is based upon Thompson's claim that his combination of gelatin-ACTH brought forth a strong and immediate response, sometimes referred to as "rapid onset." It must not be overlooked that we are here dealing with experiments in the field of biochemistry. Thompson's representations to the Patent Office were the expressed and considered professional judgment of a number of investigators. To sustain the charge of fraud in this respect would mean there was a conspiracy among several competent and highly regarded scientific men, including Holland who was later the Medical Director of the Federal Food and Drug Administration. We hold the defendant fails to meet the burden of proof required.

We have reached the same conclusion as to the other charges of fraud. We conclude there is no merit in them because they have not been established by the requisite degree of proof. The Findings and Conclusions of fraud by the District Court are not warranted on this record. They are clearly erroneous and must be and are disapproved.

The decree of the District Court awarded to the defendant its actual and reasonable attorney fees incurred in the litigation. The basis of this award is not clearly stated. We assume that it was due to the finding of fraud, a charge which we have decided cannot be sustained on this record. Whether or not our assumption is correct, we hold there is no proper basis for an award of attorney fees in this case. Continental Art Co. v. Bertolozzi, 7 Cir., 232 F.2d 131, 134; Wilson v. Seng Co., 7 Cir., 194 F.2d 399, 403–404; Laufenberg, Inc. v. Goldblatt Bros., 7 Cir., 187 F.2d 823, 825.

We consider now the holding of the District Court that Armour's commercial sale of gelatin-ACTH on October 2, 1951, invalidates the Thompson patent. The District Court held that Thompson's continuation-in-part application filed on December 27, 1952 was not entitled to the date of its parent application. We think the Court was in error in so holding.

Title 35 U.S.C.A. § 120 provides: "An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed

2. Various courts have stated that fraud must be established by evidence that is "clear and positive", "clear and satisfactory", "clear and satisfactory to a reasonable certainty", and "clear, cogent, and convincing." See 37 C.J.S. Fraud § 114, p. 429.

before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application." We hold Thompson's continuation-in-part application complies with the statute. It expressly refers to the parent application. It shows it was co-pending with such application for the parent application was not abandoned until five months later on May 14, 1953. But, the District Court stated the parent application did not teach the use of ACTH in gelatin without added ingredients. This is clearly erroneous for the parent application filed August 14, 1950 did contain a claim for gelatin and ACTH alone. That claim never was canceled nor abandoned, and was eventually issued as Claim I of the Thompson patent. We hold that a common claim filed in a parent application and carried into a continuation application is entitled, as a matter of law, to the filing date of the parent application.

The District Court held Claims I and II of the Thompson patent to be invalid because the action of gelatin-ACTH was obvious in view of the prior art. Findings of Fact 2 to 12, inclusive, are directed to this point.

The Thompson patent covers the use of gelatin and ACTH with or without additional ingredients. Concerning the role of gelatin the patent states "the magnification of effect resulting from the use of gelatin has been found to be a doubling or tripling of adrenocorticotrophic potency."

Finding of Fact 4 states, in part: "Long prior to the Thompson patent, gelatin was well known as a vehicle to increase the effectiveness of drugs, being used 'as a vehicle for subcutaneous injections when slow absorption of a drug is desired.' Gelatin was used as a retarding agent both with and without additional ingredients just as in the Thompson patent. * * *" The Finding then lists seven examples of the prior

art use of gelatin and certain named drugs without additional ingredients, and seventeen examples of certain named drugs where additional ingredients were used.

The Finding referred to a number of exhibits which were part of the prior art and which showed the use of gelatin with various drugs and illustrated how thoroughly the prior art taught how gelatin functions with therapeutic agents in a manner similar to which gelatin functions with ACTH. The fact that gelatin and ACTH were not combined before 1949 is understandable because ACTH was not recognized as a useful drug prior to Hench's Nobel prize-winning discovery which was published in the spring of 1949. It is indeed difficult to conceive that adding ACTH to the long list of drugs with which gelatin had been used and which increased the effectiveness of such drugs when slow absorption was required, could be regarded as an invention under any standard of invention.

On the question of "novelty" the District Court heard the testimony of expert witnesses. Every one of them except Thompson himself, testified it was obvious to use gelatin with ACTH. Wolfson testified: " * * * everybody knew the possibility of using gelatin as a long acting agent." Plaintiff's expert, Forsham, agreed that the use of gelatin to prolong the action of ACTH seems to be common sense simply because everybody knew about the possibility of using gelatin as a long acting agent. Plaintiff's expert, Frawley, reached the same conclusion as did defendant's experts Dr. Hier and Dr. Leake.

█ In view of the large amount of literature in the prior art on the use of gelatin, and the District Court having heard the testimony of experts (c. f. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 336 U.S. 271, 274, 69 S.Ct. 535, 93 L.Ed. 672) we cannot say the District Court's Findings were clearly erroneous. On the contrary, there is an abundance of credible evidence to sus-

tain the Court's Findings 2 to 12, inclusive.

The District Court also found the action of gelatin with ACTH is satisfactorily explained solely on the basis of retardation of absorption. There was credible evidence to sustain that Finding. Thompson, in a memorandum, stated "the effect of gelatin on ACTH action can be quite satisfactorily explained on the basis of absorption control alone." Also, Thompson's original application was entitled: "Sustained-Effect Adrenocorticotrophin." Furthermore, Drs. Klein, Leake, Dapolito and Frawley all agreed that the action of gelatin can be explained because of its acting over a longer period of time. Again, there is no possible justification for us to say that this Finding was clearly erroneous. Nor do we have any basis for saying that the proper standard of invention was not applied by the District Court.

We think our discussion up to this point adequately covers the point separately argued by defendant that the Thompson patent also is invalid because it lacks invention over the prior art, and involves merely a new and analogous use for gelatin. See Mandel Bros., Inc. v. Wallace, 335 U.S. 291, 296, 69 S.Ct. 73, 93 L.Ed. 12; B. & M. Corp. v. Koolvent Aluminum Awning Corporation, 7 Cir., 257 F.2d 264, 267.

True, Armour bases its argument for validity claiming a question of law is involved. This is understandable, as the detailed Findings of Fact of the District Court are amply supported by credible evidence. We repeat, there is no legitimate basis in the case at bar for this Court to say that the wrong standard of invention was applied by the District Court. Nor can it be soundly argued that the frontiers of science have, in any way, been rolled back by the suggestion to use gelatin with ACTH.

Applicable here is the language we used in Anderson v. Phoenix Products Co., 7 Cir., 1955, 226 F.2d 191, at page 193: "Inasmuch as the court has properly considered the patent and has heard the evidence, oral and documentary, and reached the conclusion that the patent was anticipated and that the alleged invention was obvious to anyone skilled in the art, we cannot disturb the judgment unless we can say as a matter of law that the findings and conclusions are plainly erroneous." Upon the record before us, this we cannot do.

The District Court also held the Thompson patent invalid because Thompson was not the first or original inventor of gelatin with ACTH. This is a close question on the record. The District Court might well have found either way. However, we cannot say that the Findings are clearly erroneous because there is support for same based upon credible evidence.

It is without dispute Klein and Wolfson discussed gelatin and ACTH in June, 1949. It was Dr. Klein of Wilson and Co., Inc., who first suggested the use of gelatin to Thompson, Dr. Klein shipped gelatin to Wolfson on September 12, 1949. Wolfson used gelatin-ACTH on his patient Loidl on September 27, 1949. This was after Wolfson had suggested that Thompson try all the "known effective delaying agents." Thompson and Wolfson started cooperative work about October 1, 1949. Thompson's first record associating gelatin with ACTH was on November 22, 1949.

Title 35 U.S.C.A. § 102 provides: "A person shall be entitled to a patent unless * * * (f) he did not himself invent the subject matter sought to be patented, * * *." There was no improper application of standards of invention as to this Finding, and as it is supported by credible evidence, it must be sustained by us.

A number of arguments have been made by both parties which we have not specifically mentioned. We think a discussion of same is not necessary to a decision of the issues in this case. To engage in such a discussion would unduly extend this already lengthy opinion.

We hold that part of the judgment below which found and held that Thomp-

son Patent No. 2,669,537 is invalid, must be and is affirmed. That part of the judgment awarding attorney fees to the defendant will be reversed. The costs and disbursements in this Court shall be divided. Defendant may recover two-thirds (⅔) of the costs which would ordinarily be awarded to a prevailing party.

Affirmed in part, reversed in part.

## Is the Validity of a Patent a Question of Fact or a Question of Law?

HASTINGS, Chief Judge.

Our court, *sua sponte,* determined to hear this appeal *en banc* in order to resolve for our circuit the standards to be applied in determining the validity of a patent within the scope of our appellate review. We invited counsel to submit separate briefs on this problem and to address themselves to it in the course of their oral argument. We are deeply indebted to Casper W. Ooms, of Chicago, and Roger T. McLean, of New York, two eminent members of the patent bar, for their thorough and exhaustive treatment of this problem, in response to our invitation.

The question has frequently been phrased in terms of whether the validity of a patent is a question of fact or of law. Couched in this language, it has continued to perplex this court and other courts of appeal. Yet, it can hardly be resolved in such abstract terms limited to patent litigation. It can better be considered in the light of our appellate review of civil litigation generally.

It may be helpful first to review the holdings of this circuit dealing with the question of patentable invention or infringement. Prior to the decision of the Supreme Court of the United States in Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 1948, 336 U.S. 271,

69 S.Ct. 535, 93 L.Ed. 672, our court had held that patentable invention is a question of law. National Slug Rejectors v. A.B.T. Mfg. Corporation, 7 Cir., 1947, 164 F.2d 333, 336, certiorari denied, 1948, 333 U.S. 832, 68 S.Ct. 459, 92 L.Ed. 1116; Harley C. Loney Co. v. Ravenscroft, 7 Cir., 1947, 162 F.2d 703, 704.

In Graver, [69 S.Ct. 537] Mr. Justice Jackson, speaking for the Court, held that "where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations," Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S. C.A., was clearly applicable and that an appellate court would reverse only "clearly erroneous" findings. In the absence of such "clearly erroneous" findings, the Court affirmed, stating that "[w]hile the ultimate question of patentability is one of meeting the requirements of the statute, * * * the facts as found with respect to these four flux claims warrant a conclusion here that as a matter of law those statutory requirements have been met." 336 U.S. at pages 274, 275, 69 S.Ct. at page 538. Mr. Justice Black, joined by Mr. Justice Douglas, concurred in the result but expressed the view, id., 336 U.S. at page 280, 69 S.Ct. at page 540, that "determination of the ultimate question of patentability cannot properly be classified as a finding of fact" and that he would adhere to the Court's earlier pronouncement that "whether the thing patented amounts to a patentable invention" is a question of law.[1] A rehearing was allowed on the question of infringement of the claims held valid, and the application of the doctrine of equivalence thereto. In a decision reported at 1950, 339 U.S. 605, 609, 70 S.Ct. 854, 857, 94 L.Ed. 1097, the Court stated that "[a] finding of equivalence is a determination of fact."

In Hazeltine Research v. Admiral Corp., 7 Cir., 1950, 183 F.2d 953, 954–

---

1. Citing Mahn v. Harwood, 1884, 112 U.S. 354, 358, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665, and dissenting opinions in Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 280, note

1, 64 S.Ct. 593, 88 L.Ed. 721, and Williams Mfg. Co. v. United Shoe Machinery Corp., 1942, 316 U.S. 364, 383, 62 S. Ct. 1179, 86 L.Ed. 1537.

955, certiorari denied 1950, 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650, in an opinion by Chief Judge Major, this court followed the holding in Graver that Rule 52(a) has application to findings of fact based upon the conflicting testimony of expert witnesses. After reviewing the extent and effect of the holding in Graver, the court in Hazeltine concluded, 183 F.2d at page 955:

"Thus, there is no room longer to doubt that the issues most prevalent in patent litigation, and particularly those of validity or invalidity, infringement or non-infringement, are issues of fact and that a finding by the trial court on such issues is within the terms of Rule 52(a), which a court of review is not at liberty to set aside unless 'clearly erroneous.' *Thus, factual issues in a patent case must be tried and decided by the trial judge in precisely the same manner as those in any other kind of law suit, and the function of this court on review is no different than that in any other kind of a case.*" (Emphasis added.)

The holding in Hazeltine was given express approval by our court in Weller Manufacturing Co. v. Wen Products, Inc., 7 Cir., 1956, 231 F.2d 795. Judge Lindley stated, at page 797:

"[I]nasmuch as Judge Barnes [the trial judge] had before him in a 9 days' trial, the extended controversial testimony of expert witnesses on behalf of the respective parties, as well as that of the patentee, certain witnesses skilled in technical learning and other witnesses concerning pertinent factual matters, *in addition to extensive documentary evidence, models and other physical exhibits,* the rule we announced in [Hazeltine] is applicable to the present situation. In other words, just as, in that case, we felt that, in view of the conflicting testimony of expert witnesses and other controversial testimony, we were not at liberty to deny the applicability of Rule 52(a) * * *, so here,

after an examination of the record and consideration of the conflicts between the witnesses, we have no right, we think, to redetermine the findings of fact of the District Court or to say, as a matter of law, that they are clearly erroneous."

Again, in Kraft Foods Co. v. Walther Dairy Products, 7 Cir., 1956, 234 F.2d 279, at page 281, Judge Finnegan said: "No sound legalistic basis has been found, after an extensive study of the record before us, warranting deviation from the Hazeltine explanation [of Graver] and application of Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.," but added in conclusion, at page 284: "The question of validity of a patent, *a question of law,* was correctly decided by the trial judge." (Emphasis added.) See also, opinions by Judge Duffy in Wilson v. Seng Co., 7 Cir., 1952, 194 F.2d 399, 402; Barie v. Superior Tanning Co., 7 Cir., 1950, 182 F.2d 724, 727; Falkenberg v. Bernard Edward Co., 7 Cir., 1949, 175 F.2d 427, 430.

The so-called "Documentary Rule" was recognized in the Weller case as an exception to the applicability of Rule 52(a), as laid down in Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 1950, 181 F.2d 855, certiorari denied 1950, 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605, and Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 1949, 178 F.2d 794, certiorari denied 1950, 339 U.S. 915, 70 S.Ct. 575, 94 L.Ed. 1340. The rule was recently reiterated in Kiwi Coders Corporation v. Acro Tool & Die Works, 7 Cir., 1957, 250 F.2d 562, at page 568, where we said: "Since the evidence in this case is all either documentary or in the form of physical exhibits, we are in as good a position as the trial court to examine it and determine for ourselves whether or not there is infringement of the patent claims in issue. Under these circumstances 'the findings of the District Court are deprived of the degree of finality which would otherwise attach under Rule 52.'"

In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, the

Supreme Court considered the concurrence of a district court and the court of appeals in holding three patent claims of a combination patent to be valid. The opinion was delivered by Mr. Justice Jackson, the spokesman for the Court in Graver. Because of the subsequent influence of the A. & P. case, we shall call attention to some of its pertinent language. The statement of the precise issue considered by the Court appears at the outset, 340 U.S. at page 148, 71 S.Ct. at page 128, as follows:

"*The issue*, for the resolution of which we have granted certiorari, *is whether they* [the two courts below] *applied correct criteria of invention.* We hold that they have not, and that *by standards appropriate for a combination patent these claims are invalid.*" (Emphasis added.)

The Court then reaffirmed the negative rule governing combination patents as previously anounced in Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008. In its concluding paragraph, 340 U.S. at pages 153-154, 71 S.Ct. at page 131, the Court took cognizance of Graver, stating:

"It is urged, however, that concurrence of two courts below, in holding the patent claims valid, concludes this Court. A recent restatement of the 'two-court rule' reads, 'A court of law, such as this Court is, rather than a court for correction of errors in fact finding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error.' Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 275, 69 S.Ct. 535, 538, 93 L.Ed. 672. The questions of general importance considered here are not contingent upon resolving conflicting testimony, for the facts are little in dispute. We set aside no finding of fact as to invention, for none has been made except as to the extension of the coun-

ter, which cannot stand as a matter of law. *The defect that we find in this judgment is that a standard of invention appears to have been used that is less exacting than that required where a combination is made up entirely of old components. It is on this ground that the judgment below is reversed.*" (Emphasis added.)

Mr. Justice Douglas, joined by Mr. Justice Black, concurred on the same grounds they expressed in Graver, again saying, 340 U.S. at page 155, 71 S.Ct. at page 132; "The standard of patentability is a constitutional standard; and the question of validity of a patent is a question of law." However, they once more criticized the "two-court rule" laid down in Graver in the following language, 340 U.S. at page 156, 71 S.Ct. at page 132: "That rule, imported from other fields, never had a place in patent law. Having served its purpose in Graver Tank & Mfg. Co. v. Linde Air Products Co., *it is now in substance rejected.* The Court now recognizes what has long been apparent in our cases: that *it is the 'standard of invention' that controls.* That is present in every case where the validity of a patent is in issue. It is that question which the Court must decide. No 'finding of fact' can be a substitute for it in any case. The question of invention goes back to the constitutional standard in every case." (Emphasis added.)

It is not for us to say whether the Court in A. & P. rejected the rule laid down in Graver. Chief Judge Major did not seem to think it had done so in O'Brien v. O'Brien, 7 Cir., 1953, 202 F.2d 254, 255–256, where he reaffirmed our holding in Hazeltine. However, he did entertain some doubt as to the effect of the rule in Graver, following a reversal of this court in Trager v. Crest Specialty, 7 Cir., 1950, 184 F.2d 577, by the Supreme Court in a per curiam opinion 1951, 341 U.S. 912, 913, 71 S.Ct. 733, 95 L.Ed. 1349, citing only Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127,

95 L.Ed. 162. In Trager, our court, speaking through Judge Lindley, had affirmed a holding of validity and infringement largely upon the findings made by the district court, citing Graver and Hazeltine.

It is apparent that a number of other circuits, following A. & P., have held that the question of validity is one of law, or that the ultimate question of invention is one of law, or that the application of the proper criteria or standards for patentability are questions of law. Typical of such recent opinions are Tatko Bros. Slate Co. v. Hannon, 2 Cir., 1959, 270 F.2d 571, 572, certiorari denied 1959, 80 S.Ct. 260 [2]; Houston Oil Field Material Co. v. Claypool, 5 Cir., 1959, 269 F.2d 134, 137 [3]; Rohr Aircraft Corporation v. Rubber Teck, Inc., 9 Cir., 1959, 266 F.2d 613, 618–619 [4]; Steffan v. Weber Heating & Sheet Metal Co., 8 Cir., 1956, 237 F.2d 601, 602 [5]; Blish, Mize & Silliman Hardware Co. v. Time Saver Tools, Inc., 10 Cir., 1956, 236 F.2d 913, 916 [6].

We look now to the influence of A. & P. on this circuit. In Noble Co. v. C. S. Johnson Co., 7 Cir., 1957, 241 F.2d 469, in an opinion by Judge Schnackenberg, we reviewed a holding of invalidity by the district court based upon 41 findings of fact and 18 conclusions of law. At the outset, Rule 52(a) was invoked as being applicable in such a review, and upon examination of the record we held, at page 476: *"(1) that the findings of fact made in the court below are not clearly erroneous and are supported by substantial evidence, and (2) that, in finding the ultimate facts, that court applied the correct criteria of law to the evidentiary facts."* (Emphasis added.) The court goes on to say that in reaching this result, *"we have excluded finding 40, which, in effect, found the patents invalid, because, in our opinion, this in-*

---

2. In Tatko, in passing upon patent validity, it was said, 270 F.2d at page 572: "In this task, the scope of review is clearly defined by the decided cases: primary, or evidentiary, findings of fact may not be disturbed unless clearly erroneous; but the inferences and conclusions, based upon the primary facts, upon which depends the ultimate findings of patentability, as well as the standard of invention applied below, are questions of law fully reviewable in this court." (Citing A. & P. and Blish, infra, 236 F.2d 913)

3. In Houston, the court said, 269 F.2d at page 137: "Of course, in patent cases, as in all other cases tried by the court without a jury, disputed fact issues must stand as resolved by the trial court unless found to be clearly erroneous, F.R. Civ.P. Rule 52(a), 28 U.S.C.A. However, the question whether a particular patent meets the standard of invention is a fully reviewable question of law. Little Mule Corp. v. Lug All Co., 5 Cir., 254 F.2d 268, 276; Fritz v. Glitsch & Sons, Inc. v. Wyatt Metal and Boiler Works, 5 Cir., 224 F.2d 331, 335."

4. In Rohr, the court said, 266 F.2d at pages 618–619: "The nature of the prior art and what plaintiffs did to improve upon it, of course, are questions of fact. [See citations to Ninth Circuit cases in footnote 5] However, such questions are preliminary to the ultimate question of invention. * * * [See citation to Deller's Walker on Patents, 1957 Supp. to Vol. 1, § 25, page 115, in footnote 6] The question we now reach is whether [plaintiff's improvement over the prior art] is such a significant advance over the prior art as to raise it to the standard of invention. Since [A. & P.], there is no longer any doubt that such a question is one of law." (See citation to Mr. Justice Douglas' concurring opinion in A. & P. in footnote 7)

5. In Steffan, the court said, 237 F.2d at page 602: "The question of whether any improvement involves merely mechanical skill or inventive genius is ordinarily a question of fact, and the findings of the trial court upon such issue shall not be set aside unless clearly erroneous. * * * [Citing Graver and Trico Products Corp. v. Delman Corp., 8 Cir., 180 F.2d 529, 530] A question of law may be involved where the trial court has applied an improper standard of invention." (Citing A. & P.)

6. In Blish, the court said, 236 F.2d at page 916: "The statute accords presumptive validity to the patent, 35 U.S.C. § 282, and the trial court's judgment gives added weight. But the ultimate question of validity is one of law for us to decide for ourselves upon the record." (Citing A. & P. and other cases)

*volves a question of law rather than one of fact."* (Citing Graver and A. & P.) (Emphasis added.) Then follows an analysis of these two cases, and other decisions, and their application to the foregoing statement, pointing out an apparent conflict of opinion among the courts of appeals on "the question of whether validity is a question of fact or a question of law." Footnote 9, at page 477.

Next followed Hobbs v. Wisconsin Power & Light Co., 7 Cir., 1957, 250 F.2d 100. There we were concerned with the issue arising "from alleged erroneous applications of the law to the facts by the trial court." Id., at page 101. In determining the standard to be applied to the scope of our review, we said, at page 103: *"The question of whether or not a trial court has employed the correct criteria of invention in determining the validity of a patent is one of law subject to review on appeal."* (Citing A. & P. and Noble Co. v. C. S. Johnson Company) (Emphasis added.) Further, "this court, under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. must make due allowance for the advantages possessed by the trial court in resolving any conflicting testimony, reversing only clearly erroneous findings of fact." Citing Weller and Noble Co. v. C. S. Johnson Company.

In New Products Corp. v. Outboard, Marine & Mfg. Co., 7 Cir., 1959, 263 F.2d 521, in another opinion by Judge Schnackenberg, we find plaintiff relying upon Rule 52(a) to sustain certain findings as being " 'to the effect that the Banker patent in suit is valid.' " Id., at page 524. Citing Noble Co. v. C. S. Johnson Company the court said, ibid., *"However, the question of validity is one of law * * *, to which rule 52(a) has no application."* (Emphasis added.) It is this declaration that has provoked some disagreement in our court. The

opinion continues with the further statement, at page 525: "Validity being a matter of law, we are not inhibited by rule 52(a) from passing upon it upon appeal," (citing A. & P.), and concludes: *"We have a right to determine whether the district court applied the correct criteria of invention. We hold that it did not do so."* (Emphasis added.)

The latest expression from our court is to be found in Hoover Co. v. Mitchell Manufacturing Co., 7 Cir., 1959, 269 F.2d 795. In this opinion by Judge Major, the author of Hazeltine and O'Brien, the court sustained the findings of fact and conclusions of law as determined by the district court. When pressed by appellant that the district court had not applied the correct rule of law to certain facts relating to the proof of prior use, the court said, at page 805: *"We agree that the application of incorrect criteria of law to the evidentiary facts is reviewable on appeal as a matter of law."* (Citing Noble Co. v. C. S. Johnson Company) (Emphasis added.)

Thus, it becomes apparent that *the confusion* arising from the attempt to phrase the proper standard governing the determination of patentable invention *stems from the indiscriminate use of mere labels,* which in themselves are not conclusive. We have come to speak of questions of "facts", "primary facts," "subsidiary facts," "evidentiary facts," "ultimate facts," "physical facts," "documentary facts," "oral evidence," "inferences," "reasonable inferences," "findings of fact," "conclusions," "conclusions of law," "questions of fact," "questions of law," "mixed questions of law and fact," "correct criteria of law," and so on *ad infinitum.* The simple answer is that we are all too frequently dealing in semantics, and our choice of words does not always reflect the magic we would prefer to ascribe to them.[7]

**7.** See Note, "Patentable Invention as a Question of Law," 43 Ill.L.Rev. 535 (1948); Robert L. Stern, "Review of Findings of Administrators, Judges and Juries: A Comparative Analysis," 58 Harv.L.Rev. 70 (1944); Jerome Frank, "Words and Music: Some Remarks on Statutory Interpretation," 47 Colum.L

**156**

■ Fundamentally, we are here concerned with the problem of statutory construction, namely, construing 35 U.S.C.A. §§ 102 and 103, governing the conditions for patentability. This is certainly within the province of an appellate court, and we find no good reason to believe that the Patent Act is any exception to the general rule. Statutory construction is a question of law.

■ Likewise, we believe it is sound to say that in the trial of a patent case the determination of the factual issues should be accomplished in the same manner and subject to the same rules and exceptions as in any other type of civil litigation. The rationale of Rule 52(a), 28 U.S.C.A. is entirely consistent with its application to patent cases within the scope of appellate review. The development of the factual content necessary to statutory construction is a question of fact.

■ The question of what constitutes patentable invention can be broken down "into its component parts: what the prior art was and what the patentee did to improve upon it, and then, whether what the patentee did is properly to be classified as an invention." Walker on Patents (Deller's Edition), 1958 Cum. Supp., § 25, page 26.

■ The first part relates to the showing made by the prior art before the patentee produces his invention. This is to be determined upon the basis of testimony and documentary or physical exhibits. The testimony relates to the use made of prior art, and the documentary and physical exhibits do not stand mute but speak for themselves. Upon review, these are facts subject to Rule 52(a) and the exception found in the "Documentary Rule."

■ The next element is concerned with the nature of the improvement the patentee has made over the prior art. Has he taught anything that is different? If there is no improvement, the patent

is anticipated under Section 102 of the Patent Act. If there is an improvement, we look to Section 103 to see whether there is a difference or to ascertain the nature of the improvement over the prior art. The determination of this element of "novelty" usually finds its genesis in expert testimony and as such is a question of fact, and on appeal, is within the scope of Rule 52(a).

The factual determinations made in these first two steps would seem to be controlled by the rule laid down in Graver Tank & Mfg. Co. v. Linde Air Products Co., 1948, 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672, and as followed in our decisions in Hazeltine Research v. Admiral Corp., 7 Cir., 1950, 183 F.2d 953 and O'Brien v. O'Brien, 7 Cir., 1953, 202 F.2d 254.

■ The final step involves the resolution of the meaning of Section 103 of the Patent Act to determine, from the language of the statute, whether "the differences between the subject sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." This requires the application of the correct legal criteria to the factual determination made by the trial court. This calls for the exercise of a legal judgment and as such is subject to review by an appellate tribunal as a question of law.

Strong support for this approach to the application of the legal test of patentability to the factual framework developed in the trial may be found in the language used in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 128, 95 L.Ed. 162. As we have earlier pointed out, the Supreme Court defined the issue in A. & P. to be whether the two courts below had "applied correct criteria of invention," and then found the judgment below defective in that an im-

Rev. 1259, 1274 (1947); Walker on Patents (Deller's Edition), 1958 Cum.Supp.

§ 25, pages 26–27; 5 Moore's Federal Practice §§ 52.04 and 52.05[2].

proper "standard of invention" had been used, and reversed. It is the application of this principle of law that we read into Noble Co. v. C. S. Johnson Co., 7 Cir., 1957, 241 F.2d 469; Hobbs v. Wisconsin Power & Light Co., 7 Cir., 1957, 250 F.2d 100; and into Hoover Co. v. Mitchell Manufacturing Co., 7 Cir., 1959, 269 F.2d 795.

After surveying the field since Graver in 1948 and A. & P. in 1950, and observing the variegated colors produced from the seeds we all have widely sown, we have concluded that the rules governing the trial of patent cases are no different than in other types of civil litigation, and further, that the scope of our review on appeal follows the same pattern. We look at the *findings of fact as to invention in* the way that such factual determinations are generally reviewed. We examine the *standard of invention* applied to these facts as a question of law, as we have done in other areas. If anything we have said in prior opinions strays too far from this conclusion, such holdings are now modified to conform to the views expressed herein.